Mary Lou MEINERS, Director, State of Alaska, Division of Elections, Stephen A. McAlpine, State of Alaska, Lieutenant Governor, Sue Eckels, Robert Foote, and Henry Ivanoff, Appellants and Cross-Appellees,

v.

BERING STRAIT SCHOOL DISTRICT, Appellees and Cross-Appellants,

and

Chuck Degnan, Joseph Nongwook, and Jonah Tokienna, Appellees.

Nos. S–125, S–140.

Supreme Court of Alaska.

July 27, 1984.

Jonathan B. Rubini, Asst. Atty. Gen., Norman C. Gorsuch, Atty. Gen., Juneau, for appellants and cross-appellees.

John S. Hedland and Janalee R. Strandberg, Hedland, Fleischer & Friedman, Anchorage, for appellees and cross-appellants.

Robert C. Erwin, Erwin, Smith & Garnett, Anchorage, for appellees Degnan, Nongwook and Tokienna.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

In April and May of 1983 several dissatisfied residents of the Bering Strait R.E.A.A. School District drafted and circulated a recall petition. This appeal and cross-appeal are taken from the superior court's judgment enjoining the holding of a recall election for certain School Board members. We reverse in part.

### I. STATUTORY BACKGROUND

The Bering Strait School District is a Regional Educational Attendance Area (REAA) in Western Alaska established pursuant to AS 14.08.031 *et seq.* and governed by a regional school board of eleven elected members. Recall of regional school board members is provided for in AS 14.08.081, which incorporates the statutes relating to

the recall of city and borough officials, AS 29.28.130–.250.

The portions of AS 29.28.130–.250 which provide the background for the present controversy are as follows. AS 29.28.130 specifies that an elected official may be recalled after serving six months in office. Section 140 reads in full, "Grounds for recall are misconduct in office, incompetence, or failure to perform prescribed duties." Section 150 provides that for municipal recalls the petition is to be filed with the municipal clerk, but AS 14.08.081 vests the clerk's duties in the state Division of Elections when a REAA school board member is the subject of the recall, and further provides that "the lieutenant governor shall perform the functions of the assembly or council ...." Incorporating AS 29.28.-070(b), section 150 then provides that in areas with fewer than 7500 persons, such as the Bering Strait REAA, the petition must be signed by a number of registered voters representing at least 25 percent of the total number of votes cast "at the last general election in the ... area concerned, or special election called for the purpose of electing city or borough officers." The petition must be filed within 60 days after the date of the earliest signature, and must contain "a statement of the grounds of the recall stated with particularity as to specific instances."

"The municipal clerk [or, here, the Division of Elections] shall review the petition for content and signatures" within 10 days after it is filed. AS 29.28.160. If the number of signatures is insufficient, the sponsors may supplement it with additional signatures within 10 days after the date that it is rejected. AS 29.28.170(a). If the petition is insufficient for any other reason, it is rejected and filed as a public record. *Id.* If no regular election is scheduled within 75 days, the Lieutenant Governor is directed to hold a special election within that period. AS 29.28.200(b); AS 14.08.081.

Under AS 29.28.210, the recall ballot must contain "the grounds as stated in the recall petition" and a rebuttal of up to 200 words from the target official, if submitted at least 20 days before the election. If the officer successfully resists a recall election, another recall petition may not be filed against the officer for six months. AS 29.28.240. If the officer is recalled, another election is held to select a successor. AS 29.28.250.

## II. FACTS

In April and May 1983, a group of voters in the REAA presented to the Division of Elections a petition for the recall of all eleven members. The petition, as circulated, read in full as follows:

> We the undersigned, as registered voters in the Bering Strait School District, petition the commision [sic] of elections to hold a recall election for the eleven members of the Bering Strait School Board. The present members are: Chuck Degnan, Francis Degnan, R.R. Blodgett, Don Jackson, Howard Lincoln, Clifford Weyiounna, Joseph Noongwook, John Cheemuk, Roger Nassuk, Jonah Tokeinna, Herbert Appassingok. We cite the failure of the present board to perform the prescribed duties of their office.
>
> 1. We cite the failure to control the administrative practices of superintendent Ron Hohman. The superintendent has made large appropriation of district funds on his own judgement for non-district, non-student, and non-educational programs. An example is a $230,000 appropriation to the adventure based education program of another school district. A trip by Bethel students to London, a play by the Bethel theater group and other monies spent around the state benefited *no* students from the Bering Strait School District. The State of Alaska Department of Education has ruled that this money was spent in a totally inappropriate manner. Our board has failed to hold the superintendent responsible for these monies. We also cite alledged [sic] coercive and illegal means used by the superintendent to prompt his staff to perform activities of a non-

educational manner including circulation of a statement of support among teachers, and use of district staff to promote his own election bid for a national position.

2. We cite the failure. of the school board to provide full and open communication between themselves and the voters of the district. The board has failed under state statutes to provide its constituents adequate notice of school board meetings and functions. The board has failed under the common rules of order to set time and date of the next meeting while in regular session. The board has also failed to provide adequate public disclosure of minutes. The board has only met in regular session four times from June 1982 through the 1st of April 1983 a period of eleven months, yet the board publicly claims that policy calls for monthly meetings. The board has also failed to provide the public access to the board agenda. At the last regular meeting held on April 7, 1983 a petition containing over three hundred names as well as resolutions passed by a majority of the A.E.C./P.A.C. members in our district calling for the removal of Ron Hohman from his position was denied the right to be added to the agenda by Chairman Chuck Degnan.

3. The board has failed to deal with allegations of conflict of interest and unethical behavior among its members and board. According to common law public officials must not give the appearance of personal gain from holding a position on a board. Yet Chairman Chuck Degnan publicly claims to be "paid" twenty thousand plus dollars per year for his position. R.R. Blodgett's business concerns conduct massive amounts of business with the school district. Also R.R. Blodgett made an abusive

and derogatory phone call to a concerned parent in February of 1982 and the board was asked to conduct a complete investigation into the matter and this order of business has never been officially addressed by the board.

This petition begins its circulation on April 11, 1983 and all signatures will be secured within the sixty days prescribed by law.

The Division of Elections verified 249 signatures, and concluded that only 198 were necessary to meet the requirements of AS 29.28.150 and AS 29.28.070(b), interpreting the required number to be 25 per cent of the number of votes cast at the last regular election for school board members, held in October 1982. Therefore, on May 11, the Division certified the petition. With the assistance of attorneys from the state Department of Law, the director of the Division of Elections rewrote the petition to correct perceived problems with its language and statements of law. The director sent this rewritten document to the school board members and invited them to submit 200-word rebuttals. The Lieutenant Governor set July 12 as the date for the recall election, making June 22 the deadline for submitting rebuttal statements.

On June 3, the Bering Strait School District filed the present suit in superior court in Juneau against the director of the Division of Elections, the Lieutenant Governor, and three of the proponents of the petition.[1] As relevant to the present appeal, the District sought a declaratory judgment that the recall petition was invalid and an injunction against holding the recall election. The district claimed that the petition did not set forth conduct which came within the statutory grounds for recall, that the Director of Elections erred in placing on the ballot language different from that in the petition, that the petition had insufficient signatures, and that it did not appear that the signature pages, when circulated,

---

1. Since, in its present posture, this case is concerned primarily with actions which were taken or should have been taken by the director of the Division of Elections, we shall not hereafter refer to the Director's co-parties, but shall refer simply to "the Director of Elections."

had been physically attached to copies of the statement of grounds for recall.[2]

The School District moved for partial summary judgment on the claims enumerated in the preceding paragraph. Three of the school board members intervened in support of the District's position.

In the meantime, the Director of Elections reconsidered and decided that the ballot should contain the text of the charges as stated in the petition, rather than the modified text that had previously been prepared. The Director said that her staff then attempted to contact all the board members by telephone and letter to allow them an opportunity to amend their rebuttal statements. The staffers reached only five of the eleven.

The superior court enjoined the recall election, holding that the Director of Elections had misinterpreted AS 29.28.070(b), the statute fixing the number of signatures required. According to the superior court, the "last general election" meant the election for statewide offices held in November 1982, not the last regular election of school board members held in October 1982. Since substantially more persons had voted at the November general election, the 249 signatures were less than 25 per cent of that total.

Although the superior court found this issue dispositive, it commented on the others as well. The court found no merit in the allegation that signature pages were circulated without the statement of charges, and this issue has not been pursued further. The superior court stated that the Director of Elections had no authority to print the grounds for recall on the ballot in language different from that in the petition, and that the last-minute opportunity which had been offered to the school board members to amend their rebuttal statements had been inadequate. Finally, the superior court intimated that the allegations in paragraphs 1 and 3 of the recall petition, while sufficiently specific,

did not come within the statutory grounds for recall.

The superior court's concluding remarks were, "I will grant the plaintiff's Motion for Summary Judgment and enter an order prohibiting the Director of the Division of Elections from proceeding with this election on July 12th or at any other time until a petition is filed pursuant to the statutes with the required number of signatures."

When a petition is rejected for lack of sufficient signatures, AS 29.28.170(a) allows the sponsors 10 days to collect enough signatures to satisfy the statute. The sponsors of the recall took advantage of this opportunity. Adding the new signatures to the ones previously verified, the Division of Elections verified 479 signatures, in excess of 25 percent of the 1702 persons in the REAA who had voted in the November 1982 general election. Again seeking the advice of the Department of Law, the Director of Elections concluded that paragraphs one and two of the petition were legally sufficient and that paragraph three was not. Paragraphs one and two were to appear on the August 30, 1983 ballot as they had on the petition, with paragraph three omitted. Board members were notified and invited to submit rebuttal statements.

The school district responded with a renewed motion for summary judgment, alleging that neither paragraph one nor paragraph two was legally sufficient to charge conduct within the statutory grounds for recall. The intervenors also alleged that the 10-day period for additional signatures could not follow a judicial, as opposed to an administrative, determination that the petition had insufficient signatures, and that the Director of Elections was required to place all or none of the petition on the ballot.

The superior court ruled that the collection of additional signatures within 10 days after its earlier decision had been proper,

2. The complaint also alleged that the Division should be required to conduct any recall election in the Inupiat and Yupik languages as well as English. This issue is not relevant to the present appeal.

but agreed with the intervenors that the petition in its entirety must go on the ballot. The superior court further concluded that paragraphs 1 and 3 were legally insufficient, and paragraph 2 was insufficient in part, and that therefore no election could be held on the petition. The superior court certified a partial judgment for immediate appeal under Civil Rule 54(b). The state officials appealed, and the school district cross-appealed. The recall election has not been held.

## III. HISTORY AND NATURE OF THE RECALL PROCESS

Before turning to the specific issues raised in this appeal, we deem it appropriate briefly to discuss the recall process in general. Recall came into the American political process in the early years of this century, frequently as a companion to the initiative and referendum. All three give voters a check on the activities of their elected officials above and beyond their power to elect another candidate when the incumbent's term expires.[3]

Recall can be, and has been, viewed from a number of different perspectives. At one end of the spectrum is the view that recall is "special, extraordinary, and unusual," and produces the "harsh" result of removing an official prior to the expiration of the fixed term to which he was elected. *State ex rel. Palmer v. Hart*, 655 P.2d 965 (Mont. 1982). From this perspective, one emphasizes the legal as opposed to the political character of the recall process. The statutory grounds for recall are construed narrowly, in favor of the officeholder. All doubts are resolved against forcing the officer to face the voters in a recall election. Likewise, procedural statutes are strictly construed. There is no doctrine that "substantial compliance" with the procedures is sufficient and that technical errors will be overlooked after-the-fact. Any violation of the prescribed procedures is sufficient to invalidate the recall effort.[4]

At the other end of the spectrum, recall can be seen as an essentially political process in which the role of judicial or administrative review is minimal and all doubts are resolved in favor of placing the recall question before the voters. Influenced by this philosophy, some states have no statutory grounds for recall; disagreement with an officeholder's position on questions of policy is sufficient.[5]

The history of recall in Alaska, although it sheds little light on the specific questions we must decide, appears to follow a middle ground between these two positions. Recall entered Alaska law in 1949. Before that time, dissatisfied taxpayers could bring removal proceedings against a municipal officer in the territorial district court: the statutory grounds were malfeasance, misfeasance or nonfeasance. *See* § 16-1-61, ACLA 1949. Elective recall, the forerunner of our present recall provisions, was established by ch. 90, SLA 1949. The ballot was to include the reason or reasons for recall. Grounds were malfeasance, misfeasance or nonfeasance. Petition-signers were to swear that the petition's allegations were true to the best of their knowledge and belief, and a 65% majority was needed for a successful recall. Six years later, the Territorial Legislature changed the required percentage to a simple majority. Ch. 126, SLA 1955. It was this statute that formed part of the background for the Constitutional Convention's deliberations on the subject.

3. For an account of one state's experience with recall and an examination of the complex relationships among recall, initiative and referendum, *see* Cohen, *Recall in Washington: A Time for Reform*, 50 Wash.L.Rev. 29, 32–39 (1974).

4. *See Kotar v. Zupan*, 658 P.2d 1095 (Mont. 1983).

5. *Hazelwood v. Saul*, 619 P.2d 499 (Colo.1980); *Wallace v. Tripp*, 358 Mich. 668, 101 N.W.2d 312 (1960); *State ex rel. Lottman v. Bd. of Education of School Dist. No. 103*, 201 Neb. 486, 268 N.W.2d 435 (1978); *Westpy v. Burnett*, 82 N.J. Super. 239, 197 A.2d 400 (1964).

Other states have enacted statutory grounds for recall, but these grounds have been interpreted so broadly that virtually any ground having a relationship to the officer's duties may be sufficient. *Danielson v. Faymonville*, 72 Wash.2d 854, 435 P.2d 963, 966–67 (1967).

The Convention considered a committee's proposal which included four specific grounds for recall ("malfeasance, misfeasance, nonfeasance, or conviction of a crime involving moral turpitude") and a sentence directing the Legislature to prescribe recall procedures. This proposal set off a spirited debate. The Convention first voted to delete the four specified grounds. It then moved on to consider whether or not recall should depend on "grounds" at all. Delegate White opposed allowing the legislature to specify grounds:

> The vital part of the recall movement it seems to me is that the people retain not only the right to recall a public official but to name the reasons for instituting such action and let the action itself stand or fall on the merits of the case.

Delegate Hurley offered a contrasting view:

> I think it is fair to leave it to the legislature to prescribe the grounds under which a recall petition should be circulated so as to prevent circulation of recall petitions for petty grounds in local jurisdictions by some recalcitrant officer who was not elected, which I have seen happen in my own community.

2 Proceedings of the Alaska Constitutional Convention 1237–39 (January 5, 1956). The Convention eventually adopted the provision Delegate Hurley favored. Article XI, Section 8, unchanged since statehood, reads:

> *Recall.* All elected public officials in the State, except judicial officers, are subject to recall by the voters of the State or political subdivision from which elected. Procedures and grounds for recall shall be prescribed by the legislature.

Yet the procedures and grounds the Legislature prescribed seemed to track Delegate White's views. There were numerous grounds for recall—"malfeasance, misfeasance or nonfeasance in office, failure to uphold one's oath of office, dishonest practices, and incompetency"—and the statute emphasized that "[a]ny insufficiency of form or substance in the statement of grounds for the recall shall in no wise affect the validity of the proceedings and the election." The statement of grounds was "intended solely for the information of the electors." Ch. 121, §§ 2–4, SLA 1959.

Our present statute, passed in 1972, is less liberal. Grounds for recall are now "misconduct in office, incompetence, or failure to perform prescribed duties." The petition must contain "a statement of the grounds of the recall stated with particularity as to specific instances." The reference to the statement's purely informational purpose has disappeared.[6]

The State points out that the municipal code revision of which these amendments were a part generated hundreds of pages of formal committee reports. No reference on any of these pages explains the changes in the recall statute. "Misconduct in office" and "failure to perform prescribed duties" might easily be taken to be summaries of, not subtractions from, the complicated bundle of offenses they replaced. Thus, we think it would be a mistake to read too much into the statute's history.

In construing these statutes one must keep in mind that, as here, recall petitions will frequently be initiated by voters of limited means in districts of small population in remote parts of the state. If we were to interpret the statutes in so strict a

**6.** The provisions for recall of local officials, with which we are concerned today, are usefully compared with the statutory scheme for recall of state officials, AS 15.45.470–.720, last recodified in 1960. Recall petitions for state officials (the Governor, Lieutenant Governor, and members of the Legislature) receive pre-circulation review. Grounds are "lack of fitness, incompetence, neglect of duties, or corruption." The text of the petition and the officer's response are posted at the polling places, but do not appear in full on the ballot.

AS 15.45.720 provides that: "Any person aggrieved by a determination made by the director under AS 15.45.470–15.45.710 may bring an action in the superior court to have the determination reviewed within 30 days of the date on which notice of determination was given." The case for the wisdom of pre-circulation review, rather than post-circulation review, is made in *Morton v. McDonald,* 41 Wash.2d 889, 252 P.2d 577 (1953).

manner that a petition prepared and circulated without the detailed advice of a lawyer would have no practical chance of qualifying for the ballot, we would candidly have to recognize that the effect of our decision would be virtually to negate the recall process for citizens of small communities and school districts in rural Alaska.

Since the present case involved an REAA, not a municipality or borough, the petition was reviewed and certified by the Director of Elections. The management of elections is the full-time job of the Director and her employees. The Director is able to call upon attorneys in the Department of Law with experience in election law for assistance, as was done here. But we must not overlook the fact that under AS 29.28.-160, when the election involves city or borough officers, the certifying officer is the municipal clerk. In a small municipality, this is likely to be a part-time employee with little or no legal training. Such a municipality employs no full-time attorney, and the nearest private attorney it can retain to advise it may be hundreds of miles away. The certifying process must be completed within 10 days. AS 29.28.073(a). The municipal clerk may well have been appointed by the very officials sought to be recalled. AS 29.23.360. Thus we think caution is indicated before adopting interpretations of the statutes which would require municipal clerks to make significant discretionary decisions of a legal nature.

■ Taking all these factors into account, we conclude that statutes relating to the recall, like those relating to the initiative and referendum, "should be liberally construed so that 'the people [are] permitted to vote and express their will ....'"

*Boucher v. Engstrom,* 528 P.2d 456, 462 (Alaska 1974) (citation omitted); *accord, Anchorage v. Frohne,* 568 P.2d 3, 8 (Alaska 1977). Like the initiative and referendum, the recall process is fundamentally a part of the political process. The purposes of recall are therefore not well served if artificial technical hurdles are unnecessarily created by the judiciary as parts of the process prescribed by statute.[7]

■ In addition to guiding us in our resolution of the issues in this case, these principles compel a more general observation. Each issue in this case arises because one or another of the provisions of Alaska's recall statute is in some way ambiguous. The need for judicial participation in the recall process could be decreased by more carefully drawn statutes. Article XI, section 8 of the Constitution commands the Legislature to prescribe both the procedures and the grounds for recall. The political nature of the recall makes the legislative process, rather than judicial statutory interpretation, the preferable means of striking the balances necessary to give effect to the Constitutional command that elected officers shall be subject to recall.

## IV. THE "LAST GENERAL ELECTION"

We turn first to the underlying issue which prompted the superior court to rule on the timeliness question. At issue is the interpretation of AS 29.28.070(b). This statute fixes the necessary number of signatures based on the "total number of votes cast at the last general election in the city, or borough, or borough area concerned [here, the REAA], or special elec-

---

7. *Hazelwood v. Saul,* 619 P.2d 499, 500–01 (Colo. 1980); *Westpy v. Burnett,* 82 N.J.Super. 239, 197 A.2d 400, 404 (1964).

Recall, of course, differs from initiative and referendum in that a particular person's continuance in office is at stake, and not just the fortunes of a policy or issue. This is why the recall process includes such things as a statement of grounds, AS 29.28.140, and an opportunity for the officer to present a formal rebuttal to the voters, AS 29.28.210(2). But this is a balance properly made in the recall statutes,

and, short of a constitutional due process violation not alleged here, not a reason for us to frustrate the recall process by construing the statutes more narrowly than we do statutes relating to initiative and referendum. *See Gibson v. Campbell,* 136 Wash. 467, 241 P. 21 (1925) (concurring opinion) (charges may be read much more liberally in a recall petition than in a petition for the judicial removal of a public officer, in light of the political, rather than judicial, character of the recall).

tion called for the purpose of electing city or borough officers."

AS 29.28, which pertains to municipal elections, discusses two types of municipal elections, "regular" and "special". Regular municipal elections are held on the first Tuesday of every October, while special municipal elections may be held at any time, with 20 days notice. AS 29.28.020; AS 29.78.010(14). The term "general election" is not defined in Title 29. AS 15.60.-010(9) provides that, *in Title 15* (dealing with state elections), " 'general election' means the election held on the Tuesday after the first Monday in November of even-numbered years." The superior court held that the definition from Title 15 should be applied to AS 29.28.070(b).

In challenging the superior court's ruling, the Director of Elections points out that the term "general election", as used in AS 29.28.070(b), is nowhere defined in Title 29. The Director concludes that since the statute is ambiguous, the superior court should have deferred, and we should defer, to the agency's interpretation of the statute it implements.[8] *Irby-Northface v. Commonwealth Electric Co.*, 664 P.2d 557, 560 (Alaska 1983). Based on an opinion of the attorney general, the Director of Elections has taken the position that "general election" in AS 29.28.070(b) means the "regular municipal election," not the statewide general election held in November of even-numbered years. 1980 Informal Ops. Att'y Gen. —— (No. J66–757–80; June 19, 1980).

The Director also makes the persuasive argument that voter participation is ordinarily much greater at regularly scheduled elections than at specially-called ones, and much greater at state elections than at purely local ones. The superior court's interpretation of the statute would make the number of signatures required vary significantly based only on the fortuitous circumstance of whether there has been a special local election since the last statewide general election. If there has been, the number of signatures needed on a recall petition is likely to be quite low; if there has not been a recent special local election, the number of required signatures is likely to be quite high, since it is based on the election likely to have had the largest voter turnout, the state general election. On the other hand, that variance is likely to be considerably smaller if the statute looks to the last election for local officials, whether regular or special.[9] The Director also reasons that since any recall petition would be voted on in a local election, it is logical to use prior local elections to determine the relevant voter base from which to calculate the signatures required for such a petition. These are the type of elections in which the school board members would have been initially elected.

Thus the Director concludes that the Legislature inadvertently used the term "general election" in AS 29.28.070(b), and actually meant to say "regular election", as defined in that Title. The Director observes that the term "general election" appears elsewhere in Title 29, in contexts suggesting that "regular election" was intended.[10]

---

8. We note, however, that in most cases involving AS 29.28.070(b) a municipal clerk, not the Director of Elections, will be responsible for interpreting the statute.

9. It is common knowledge that voter turnout is usually significantly higher in a "general" election, when candidates for President or Governor are on the ballot along with state legislators and state-wide initiatives and bond propositions, than in a "regular" municipal election when only city, borough, and school district candidates and propositions face the voters. That was true on the present facts.

10. *See, e.g.,* AS 29.73.020, providing in pertinent part:

The exercise of the power of eminent domain or declaration of taking [by a municipality] shall be by ordinance which shall be submitted to the qualified voters at the next regularly scheduled general election or special election called for that purpose.

Also, *compare* AS 29.68.350(a) (providing for "approval or rejection [of proposed charter] at a regular or special borough election ...") *with* AS 29.68.390(d) (providing for second submission of initially-rejected proposed charter "to the voters at a general or special borough election ...").

The superior court relied upon the legislative history of certain amendments to the recall provisions in deciding that the legislature intended to "tighten up the [recall] procedures a little bit." The court concluded that the Legislature used "general election" in .070(b) deliberately rather than inadvertently.

We reverse. The literal reading of the words used in a statute is the beginning not the end of our analysis of its meaning.[11]

■■■■ Essentially for the reasons offered by the Director, we conclude that the intent of the general statutory recall scheme is best effectuated by holding that, in AS 29.28.070(b), "the last general election in the city, borough, or borough area concerned" means the last "regular municipal election" held pursuant to AS 29.28.020 on the first Tuesday of October. There-

fore, the 249 signatures originally verified by the Director of Elections were sufficient.[12]

## V. SUFFICIENCY OF THE GROUNDS FOR RECALL

The grounds for recall specified in AS 29.28.140 are "misconduct in office, incompetence, or failure to perform prescribed duties." AS 29.28.140. AS 29.28.150(a)(3) requires the recall petition to contain "a statement of the grounds of the recall stated with particularity as to specific instances." The present recall petition in its preamble cites the board members' "failure to perform prescribed duties," then follows with three numbered paragraphs setting out particulars. The District and the intervenors argue vigorously that paragraphs one and two [13] of the petition do not allege

---

11. *Sitka v. IBEW*, 653 P.2d 332, 336 & n. 10 (Alaska 1982); *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 540 & n. 7 (Alaska 1978).

12. Alternatively, we affirm the superior court's ruling on the ground that, once it found the number of signatures to be insufficient on July 1, the proponents of the recall then had 10 days in which to obtain more signatures in an attempt to reach the prescribed total.

AS 29.28.150(b) provides that a recall petition must be filed within 60 days after the date of its earliest signature. Within 10 days after filing, the municipal clerk must certify whether or not the number of signatures is sufficient. AS 29.-28.160. AS 29.28.170(a) then provides, "If the petition is rejected because of insufficient signatures, it may be supplemented by additional signatures within 10 days after the date of rejection."

Intervenors argue that this 10-day period may follow only the clerk's review of the petition, not any subsequent judicial decision on a review of the clerk's action. They point to the need for both the officeholder and the proponents of recall to have the recall process completed quickly.

When faced with the question explicitly on the second summary judgment motion, however, Judge Schulz upheld the proponents' actions and the decision of the Director to count the signatures obtained during those ensuing ten days. He commented,

Well, if you follow the Defendant's [sic; intervenors'] argument to its logical conclusion, it would be very easy to beat one of

these Recall Petitions, simply by waiting, say, to the fifty-ninth day, file the challenge, and if you win, then contend that they didn't get the required signatures within sixty days, and so they're out.

I think the better position is to treat the Court's Decision of July 1 as a rejection under 29.28.170; and I hold that the Petitioners had ten days after that date to secure sufficient signatures, and they did it.

We agree. The intervenors' argument appears to attack the delay inherent in judicial review itself. Their alternative would allow officials resisting recall to obtain effective judicial review on this issue, but not the proponents of recall. We note that the superior court handled this case with dispatch, and that we have granted a motion to expedite this appeal, in an effort to keep delay to a minimum. We are confident that courts in future recall cases will do likewise if the circumstances warrant. As we discuss later, in considering the proper remedy in this case, if a recall effort becomes unavoidably moot before it can reach the voters, that is the end of the matter and the effort will die with the expiration of the term. See also AS 29.28.-200(c), providing that if the office becomes vacant after the recall petition is filed, the recall election shall not be held.

13. The Director of Elections conceded before the superior court that paragraph three of the petition, which alleged conflicts of interest and related behavior claimed to be unethical, was insufficient to state grounds for recall. This issue not having been preserved, we express no opinion upon it.

specific instances of failure to perform prescribed duties. We disagree.[14]

Paragraph one of the petition concerns the board's "failure to control the administrative practices of Superintendent Ron Hohman." It alleges various actions by Hohman, including expenditures of District funds, which it claims were unlawful, and alleges that the board members should have taken action to prevent such conduct by Hohman.

AS 14.08.111 sets forth ten duties of a regional school board, under the heading, "A regional school board shall".[15] AS 14.08.101 sets forth ten "powers" of a regional school board under the heading "A regional school board may".[16] The District

**14.** Since we have concluded that paragraph one of the petition alleges that the board members failed to perform prescribed duties, one of the statutory grounds for recall, we do not address the state's alternative argument that paragraphs one and two allege conduct which amounts to "incompetence" or "misconduct in office," the other two statutory grounds for recall. Hence we do not decide whether a petition which refers to only one of the three statutory grounds for recall may be held sufficient on the basis of a judgment by the municipal clerk or a court that in fact, it properly alleges conduct satisfying a different one of the three statutory grounds. The Legislature might wish to clarify its intent on this issue.

**15.** AS 14.08.111 reads in full:
Sec. 14.08.111. *Duties.* A regional school board shall:
(1) provide, during the school term of each year, an educational program for each school age child who is a resident of the district;
(2) develop a philosophy of education, principles and goals for its schools;
(3) employ a chief school administrator and approve the employment of the professional administrators, teachers and noncertificated personnel necessary to operate its schools;
(4) establish the salaries to be paid its employees;
(5) designate the employees authorized to direct disbursements from the school funds of the board;
(6) submit the reports prescribed for all school districts;
(7) provide for an annual audit in accordance with AS 14.14.050;
(8) provide custodial services and routine maintenance of school buildings and facilities;
(9) establish procedures for the review and selection of all textbooks and instructional materials before they are introduced into the school curriculum; the review includes a review for violations of AS 14.18.060; and
(10) provide prospective employees with information relating to the availability and cost of housing in rural areas to which they might be assigned, and, when possible, assist them in locating housing; however, nothing in this paragraph requires a regional school board to provide teacher housing, whether owned, leased or rented or otherwise provided by the regional educational attendance area, nor does it require the board to engage in a subsidy program of any kind with respect to teacher housing.

**16.** AS 14.08.101 reads in full:
Sec. 14.08.101. *Powers.* A regional school board may
(1) sue and be sued;
(2) contract with the department, the Bureau of Indian Affairs, or any other school district, agency, or regional board for the provision of services, facilities, supplies or utilities;
(3) determine its own fiscal procedures including but not limited to policies and procedures for the purchase of supplies and equipment; the regional school boards are exempt from the Fiscal Procedures Act (AS 37.05);
(4) appoint, compensate and otherwise control all school employees in accordance with this title; these employees are not subject to the State Personnel Act (AS 39.25);
(5) adopt regulations governing organization, policies and procedures for the operation of the schools;
(6) establish, maintain, operate, discontinue and combine schools subject to the approval of the commissioner;
(7) recommend to the department projects for construction, rehabilitation, and improvement of schools and education-related facilities as specified in AS 14.11.010(a), and plan, design, and construct the project when the responsibility for it is assumed under AS 14.11.020;
(8) exercise those other functions that may be necessary for the proper performance of its responsibilities;
(9) by resolution adopted by a majority of all the members of the board and provided to the commissioner of the department, assume ownership of all land and buildings used in relation to the schools in the regional educational attendance area;
(10) provide housing for rental to teachers, by leasing existing housing from a local agency or individual, or by entering into contractual arrangements with a local agency or individual to lease housing that what will be constructed by the local agency or individual for that purpose.

and the intervenors argue from several premises which we are unable to accept. They appear to believe that "failure to perform prescribed duties" for a regional school board member cannot be anything other than a failure to perform one of the ten acts listed in AS 14.08.111. Within section 111, they argue that paragraph (3), directing the board to "employ a chief school administrator ...," is the only one of the ten items with any relevance to the present facts.

■■■■ The District argues that the board's duty with respect to the superintendent is only to "employ" him, which it apparently contends means only to select the person who is to hold that position. AS 14.08.111(3). To "control" the superintendent, it says, is merely a discretionary function. The board may or may not do this, as it chooses. AS 14.08.101(4). We believe that this reads the word "employ" too narrowly. Implicit in the board's duty to "employ" a superintendent are duties such as the following: to determine what the duties of the position of superintendent shall be, to advise the superintendent on the manner in which its wishes him to perform his duties, to evaluate his performance, and to determine from time to time whether he should be retained or whether they should "employ" someone else. Fairly read we conclude that paragraph one of the petition alleges that the board members failed to perform their prescribed duty to "employ" a superintendent.[17]

■■■■ Our construction of AS 14.08.-111(3) does not leave AS 14.08.101(4) without meaning. There is of necessity considerable overlap between the "powers" and the "duties" of the board. AS 14.08.-101(4) authorizes the board to "appoint, compensate and otherwise control all school employees in accordance with this title;" it goes on to state that these employees are not subject to the state personnel act. Implicit in this is the board's power to make personnel rules comparable to those which the state personnel act imposes on public employees subject to its coverage. The board may well delegate to the superintendent, and through him to other employees such as principals and supervisors, its responsibility to "control" the rank-and-file employees. In doing so, it must of necessity supervise its superintendent, and that is one of the things the recall petition alleges that the board did not adequately do.

■■■■ The board members' duties include the duty to comply with statutes of general application relating to education. When the board undertakes to exercise one of its powers specified in section 101, it must do so in accordance with the law, even though it had no obligation to exercise that particular power at all. Its exercise of the power in an unlawful manner could constitute a failure to perform a prescribed duty, one prescribed by the statute of general application.

■■■■ Insofar as the petition names certain specific expenditures and alleges that they were for "non-district, non-student, and non-educational programs," we agree with the state that the petition also alleges that the board members violated Article IX, section 6 of the state Constitution, which reads:

> No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose.[18]

---

17. In *Bocek v. Bayley,* 81 Wash.2d 831, 505 P.2d 814 (1973), the Washington Supreme Court held that voting to appoint an unqualified person as a superintendent of schools constituted grounds for recall of school board members, even if the appointee met the statutory qualifications for that office. The Washington constitution specified "malfeasance or misfeasance while in office, or a violation of the oath of that office" as grounds for recall. *Id.* 505 P.2d at 817.

18. We emphasize that it is not our role, but rather that of the voters, to assess the truth or falsity of the allegations in the petition. By holding that the petition alleges that the board members failed to perform their prescribed duties, we do not decide, and have no basis for deciding, whether the members in fact failed to perform these duties. We are in a position similar to a court ruling on a motion to dismiss a complaint for failure to state a claim. For these purposes, we must take the allegations as

 This reasoning is similarly dispositive of the claim that paragraph two of the petition does not allege a failure to perform prescribed duties. Paragraph two "cite[s] the failure of the school board to provide full and open communication between themselves and the voters of the district." It goes on to list certain instances of conduct which appear to violate the state public records and public meetings laws, AS 09.25.110–.120 and AS 44.62.310. We hold that paragraph two alleges a failure to perform prescribed duties.

The District makes a slightly different but related argument under the heading, "Misstatements of the law render the petition fatally defective." In several instances, the petition refers to certain conduct as unlawful without citing specific authority: "alleged ... illegal means used by the superintendent to prompt his staff to perform activities of a non-educational manner ..."; "fail[ure] under state statutes to provide its constituents with adequate notice ..."; "fail[ure] under the common rules of order to set time and date of the next meeting ...."

 There are several answers to the argument that this language requires invalidation of the petition. One is provided by our immediately preceding discussion, holding that legal principles of general application, and not just those in AS 14.08.111, are the measure of the "prescribed duties" which a recall petition must allege a failure to perform. The state statutes alleged to require the board to provide its constituents with adequate notice are the public records and public meeting laws cited above.

 Another answer relates to our discussion earlier in this opinion of the need to avoid wrapping the recall process in such a tight legal straitjacket that a legally suffi-

cient recall petition could be prepared only by an attorney who is a specialist in election law matters. Finally, and perhaps most importantly, the statutes offer the target official an opportunity to make a rebuttal, which will be placed on the ballot alongside the proponent's statement of charges. This rebuttal statement is the proper forum in which the official may defend against the charges. If the petition alleges violation of totally non-existent laws, then it would not allege failure to perform prescribed duties. But that is not the case here. Where the petition merely characterizes the law in a way different than the official (or his or her attorney) would prefer, he or she has an opportunity to put his or her rebuttal before the voters, alongside the charges contained in the petition. It is not the place of the municipal clerk or the Director of Elections to decide legal questions of this kind.

 Similar reasoning leads us to the conclusion that the petition is not invalidated by the fact that it contains the statement: "The State of Alaska Department of Education has ruled that this money was spent in a totally inappropriate manner." This is a statement of fact. If it is not true, the board members may say so in their rebuttals. Similarly, if they believe that it is a mischaracterization of what the Department of Education actually did, or if they think that there are circumstances in mitigation which should have caused the Department to refrain from making such a judgment, it is open to the board members to make their positions known by way of rebuttal. Again, it is the responsibility of the voters to make their decision in light of the charges and rebuttals. It is not the role of the municipal clerk or Director of Elections to take the matter out of the voters' hands.[19]

true, without thereby prejudging the trier of fact's role to determine whether or not they are true.

**19.** The petition's statement concerning the State Department of Education has substantive relevance to the charges against the board members. We do not mean to imply that statements

which do not, such as a statement that "the State Committee of the Democratic Party endorses this petition" or "State Senator Joe Doe endorses this petition," could also properly be included in the recall petition.

■ Finally, the District and the intervenors argue that paragraph two of the petition, even if it states a failure to perform prescribed duties, does not state this "with particularity as to specific instances," as required by AS 29.28.150(a)(3). We reject this contention. The purpose of the requirement of particularity is to give the officeholder a fair opportunity to defend his conduct in a rebuttal limited to 200 words. We have previously held that paragraph two alleges a failure to perform duties prescribed by the public records and open meeting laws. The public record law, AS 09.25.110, makes certain records "open to the public under reasonable rules ...." The public meeting law, AS 44.62.310(e), states that "Reasonable public notice shall be given for all meetings required to be open under this section." We have previously interpreted these statutes, and given them objective content.[20] Read in light of these statutes, the petition is not impermissibly vague. Adequacy of public access to the activities of the board can be measured in terms of the reasonableness required by these statutes.

## VI. DELETION OF DISCRETE PORTIONS OF THE PETITION

Since we have concluded that paragraphs one and two of the petition state sufficient grounds to go to the voters, and the superior court found that all parties agree that paragraph three does not, we are faced with the question of whether all, part, or none of the petition should be submitted to the voters. The relevant statutes offer little guidance. Sections 160 and 170, which refer to rejection of the petition for insufficiency, do not speak to the question of partial rejection. AS 29.28.210(1) provides that "A recall ballot contains ... the grounds as stated in the recall petition." From these statutes, the superior court concluded that insufficiency of any of the allegations of the petition required rejection of the entire petition.

■ Preliminarily, we reject two other possible positions. First, AS 29.28.210(1), in stating that the ballot must contain "the grounds as stated in the recall petition," at a minimum means that the Director of Elections cannot do what she initially did in the present case: rewrite the allegations of the petition in different language. As we discussed on pages 16–18 above, there are sound reasons why neither the voters nor the target officials would be well served by the vesting of this type of discretion in the certifying officer.

A second view, advanced by none of the parties before us, also must be rejected. That is that if any one of the allegations is sufficient, the entire petition goes before the voters.[21] While this construction would avoid putting unwarranted discretionary power in the certifying officer, we think its dangers are apparent. It might force the target official to expend most of his 200 words of rebuttal fending off charges, which although legally insufficient for recall, he fears might garner the voters' attention. It invites abuse; it invites the drafting of recall petitions with little regard for the statutory grounds of recall.

■ Much of what we have said earlier in this opinion leads us to reject the superior court's construction of these statutes, that any one insufficient provision requires the entire petition to be rejected. We are of the view that such a construction would frustrate the purpose of the recall statute, significantly increasing the cost in both time and money of a recall effort. If, as was the case here, the recall petition is prepared without the assistance of legal counsel, and is attacked by counsel retained by either the target official or the public entity which he serves, the recall process would appear unduly to handicap the proponents of recall. Their only recourse if any deficiency were found would be to begin the process of circulating peti-

**20.** *University of Alaska v. Geistauts,* 666 P.2d 424 (Alaska 1983); *Malone v. Meekins,* 650 P.2d 351 (Alaska 1982); *City of Kenai v. Kenai Peninsula Newspapers, Inc.,* 642 P.2d 1316 (Alaska 1982).

**21.** One Florida appellate court has taken this position. *Wolfson v. Work,* 326 So.2d 90, 91–92 (Fla.App.1976).

tions again, with no assurance that their new petition would not fall to some different objection. The number of signatures required for a recall petition is large, so that an official's attention is not diverted from her duties to defending against a recall unless a substantial proportion of her constituents take the affirmative act of signing a recall petition. But a corollary of this is that the circulation of a recall petition can require a substantial commitment of resources.

■ Instead, we adopt the position proposed by the Director of Elections on this issue: the certifying officer may delete severable individual charges from a recall petition if those charges do not come within the grounds specified by statute. But those charges which are sufficient to meet the statute must be set forth on the ballot in full, as contained in the petition, without

revision. This approach avoids the dangers with the approaches which we have rejected. It seems to us to be the approach most fair simultaneously to the proponents of recall, the target officials, and the voters.[22]

## VII. REMEDY

■ At the time the recall petition was filed the Board consisted of eleven members elected at-large by the qualified voters of the entire rural education attendance area. Each seat on the school board was designated by letter and candidates seeking election to the Board were required to indicate the board seat sought.[23]

During the pendency of the litigation a petition to divide the REAA into sections as provided in AS 14.08.051,[24] was approved by the residents of the REAA on August 30, 1983. Since the effective date of the petition, October 4, 1983, each board elec-

---

**22.** Once again, we commend to the Legislature the suggestion that these statutes be revised to clarify its intentions.

**23.** All Board members cited in the recall petitions had been elected to a term of office through an at-large election.

**24.** AS 14.08.051 reads in full:

Sec. 14.08.051. *School board sections.*

(a) The commissioner in consultation with the Department of Community and Regional Affairs and the local communities may divide a regional educational attendance area into sections only for the purpose of nominating and electing regional school board members. If the voters in a regional educational attendance area favor election of regional school board members by sections under (b) of this section, the commissioner in consultation with the Department of Community and Regional Affairs and the local communities shall divide the regional educational attendance area into sections for the purpose of nominating and electing regional school board members. If a regional educational attendance area is divided into sections each school board member shall represent, as nearly as practicable, an equal number of persons. The basis for the division of a regional educational attendance area into sections shall be the *total population of the area as reported in the* most recent decennial federal census. If the census is five years old or older, then other reliable population data, including but not limited to population estimates based on public school enrollments, public utility connections, registered voters or certified employ-

ment payrolls, shall be used as the basis for the division of the area into sections. Each section within a regional educational attendance area shall consist of compact, contiguous territory and, as far as practicable, each section shall contain an integrated socio-economic, linguistically and culturally homogeneous area. In the division of the regional school attendance area into sections, consideration shall be given to the transportation and communication network to facilitate the administration of education and communication between communities that comprise the area. Whenever possible, municipalities, other governmental or regional corporate entities, drainage basins and other identifiable geographic features shall be used in describing the boundaries of the sections.

(b) The division of a regional educational attendance area into sections or subsequent recasting of the section boundaries may be proposed by the regional school board or by a petition. The election of each regional school board member from a section by the voters of that section of a regional educational attendance area may be proposed by petition. A petition under this section shall be filed with the director of ·elections and shall contain signatures of qualified voters in the area equal to 15 percent of the total vote cast in the most recent regional school board election. The division of the area into sections, election of each regional school board member from a section by the voters of that section, or subsequent recasting of section boundaries is subject to approval by a majority of the qualified voters voting on the question in the regional *educational attendance area at the next regu-*

tion has been by section. The three seats at issue in the October 4, 1983 REAA election were thus filled on a sectional basis. Incumbents with terms which did not expire in 1983, all of whom had been elected to a designated seat on an at-large basis, were administratively assigned to a sectional seat. While the Department of Education reduced the sections from nine to five in order to satisfy population distribution requirements, the prior system of designated seats roughly conformed to the new sectional configuration.

A. *In Light Of The Division Of The REAA Into Sections For The Purpose Of Electing Board Members, Should The Recall Election Be Held In The REAA At Large Or By Sections?*

The Director of Elections takes the position that the seven Board members named in the petition who continue to serve the term in office subject to the initial filing of the petition should be subject to recall by the constituency which initially elected them to office. In support of this position, the Director of Elections argues that the opportunity to recall an elected official is a right reserved by the constituency which initially elected the official. The Division grounds this argument on Article XI, section 8 of the Alaska Constitution, which states in part that "[a]ll elected public officials in the State, except judicial officers, are subject to recall *by the voters of the State or political subdivision from which elected.*" (Emphasis furnished). We find the Director of Elections' position persuasive.[25]

B. *If One Or More Members Of The Board Are Recalled, Should Their Successors Be Elected From The REAA At Large Or By Sections?*

Not surprisingly, the parties' answers to this question parallel the positions they took in regard to the question of the appropriate electorate for the conducting of a recall election in the circumstances of this case. Here again we are of the view that the Director of Elections' position should prevail. The Director contends that the constituency which elects and subsequently recalls a public official should elect the successor to complete the unexpired term.[26] We agree with the Director that recall is specific to a given constituency and a given term of office. Thus, we hold that any successors to recalled Board members, if

lar school board election or a special election called for that purpose, and takes effect at the next regular school board election.

(c) If a regional educational attendance area has been divided into sections, the commissioner shall recast the boundaries of the sections within 90 days following the official reporting of the decennial federal census in accordance with (a) of this section.

(d) Multi-member sections may be created. However,

(1) each seat on the regional board shall be designated by letter or number and when the declaration of candidacy or other nomination papers of a candidate for the regional school board are filed those papers must indicate the seat that the candidate seeks; and

(2) no section may be represented by more than

(A) three members, if a board consists of five members;

(B) four members, if a board consists of seven members;

(C) five members, if a board consists of nine members; or

(D) six members, if a board consists of 11 members.

(e) If a regional educational attendance area has been divided into sections, board members shall be residents of the section from which they are elected. Board members shall be elected by the qualified voters of the entire regional educational attendance area, unless the voters have approved election of members by the voters of the section under (b) of this section.

**25.** *See Kallenberger v. Buchanan,* 649 P.2d 314 (Colo.1982).

We have considered and rejected the argument of both the intervenors and the School District. The intervenors take the position that if recall elections are to be held then the recall election should be held within each particular section—if the required number of voters within the section voted for recall. The School District argues that the only constituencies that can effectuate a recall are those within each particular section.

**26.** AS 29.28.250 provides in part:

If the voters recall an officer, the clerk shall conduct an election for a successor to fill the unexpired term.

any are recalled in an election held pursuant to the remand we now order, should be elected from the REAA at large.[27]

C. *Should The Two Members Of The Board Elected To New Terms In October 1983 Be Subject To A Recall Election On The Present Petition?*

The three-year terms of three board members named in the petition were due to expire in October 1983. Board members Weyiouanna and Nassuk successfully ran for reelection pursuant to the new sectional basis. All parties agree that Board members Weyiouanna and Nassuk should not be subject to recall on the present petition for recall.

REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

---

**27.** *See Kallenberger v. Buchanan,* 649 P.2d 314, 318 n. 9 (Colo.1982).

Additionally, we think there is merit in the Director of Elections' position that at-large elections for successors do not conflict with implementation of sectional elections of Board members. In this regard the Director argues that:

Where adopted by the voters of the Bering Strait REAA, the only reasonable expectation was that sectional elections would take place as the existing terms of office expired. *See* AS 14.08.051(b) (sectional petition "takes effect at the next regular school board election").