**MATANUSKA ELECTRIC ASSOCIATION, INC., a nonprofit electric cooperative, and Wayne Carmony, in his capacity as General Manager, Appellants,**

v.

**REWIRE THE BOARD, Scott Sterling, and Edward C. Willis, Appellees.**

No. S–9506.

Supreme Court of Alaska.

Dec. 7, 2001.

---

686

Stephen M. Ellis and Jeffrey P. Stark, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellants.

A. William Saupe and William S. Cummings, Ashburn & Mason, Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Members of the rural electrical cooperative Matanuska Electric Association, Inc. (MEA), unhappy with their coop board's plans to acquire the assets of Chugach Electric Association, formed a group called Rewire the Board (Rewire) and forced a recall election of MEA directors. During ensuing litigation, the superior court held MEA in contempt for four violations of court orders forbidding attempts to influence the recall election results. At the conclusion of the case, the court awarded Rewire full reasonable attorney's fees as a prevailing public interest litigant. MEA appeals, challenging the attorney's fees award and the contempt judgments. We affirm the award of attorney's fees. We also affirm the superior court's judgment of contempt on two counts but reverse on the remaining two counts.

## II. FACTS AND PROCEEDINGS

### A. Background

The issues presented in this appeal require us to describe the history of the case in

considerable detail. MEA is an electrical cooperative organized under Alaska Statutes 10.25 and governed by a board of directors. At an October 1998 board meeting, MEA's directors met in executive session to discuss a planning committee's proposal that MEA buy the assets of another public utility, Chugach Electric. The board approved the proposal and began negotiations with Chugach Electric that same day.

A group of MEA members calling themselves Rewire the Board submitted to MEA a proposed amendment to MEA's bylaws and a petition to recall all of MEA's directors. The recall petition alleged that the board members had failed to give proper notice of a board meeting and violated board policies and open meeting requirements. MEA and Rewire member Scott Sterling requested MEA's membership list, which he sought in order to verify the signatures on Rewire's recall petition. MEA denied Sterling's request for the membership list and rejected as untimely Rewire's proposals to amend MEA's bylaws.

### B. *Superior Court Proceedings*

Rewire and two individual plaintiffs, Sterling and Edward Willis,[1] filed suit seeking declaratory and injunctive relief. Rewire moved for an order requiring MEA to obtain the services of a neutral accountant to verify the signatures on its recall petition, requiring MEA to share its member list with Rewire, and requiring MEA to accept as timely for voting at the next annual meeting Rewire's proposed bylaw amendment.

MEA opposed Rewire's motion, arguing that Rewire was merely seeking to advance the interests of the International Brotherhood of Electrical Workers (IBEW), that Rewire's recall petition and proposed bylaw amendment were invalid, and that Rewire did not have a legitimate need for MEA's membership list. MEA also filed a counterclaim seeking to have Rewire's recall petition declared invalid on grounds that it contained material misrepresentations and failed to state valid cause to remove directors.

Rewire amended its complaint to request an order requiring MEA to place its recall petition on the agenda at MEA's next annual meeting. It also sought an order appointing a special master to preside over the annual meeting and requiring MEA to place a recall vote on the agenda at the next annual meeting, notify members, permit a vote at the annual meeting, and allow Willis to inspect MEA's financial records relating to the Chugach Electric takeover.

The superior court ruled that the proposed bylaw amendment was timely, that it was not illegal as MEA claimed, and that it should be placed before MEA members at the annual meeting. The court also ruled that the open meeting violation charged in Rewire's recall petition was legally sufficient, that simultaneously accusing multiple directors of wrongdoing did not invalidate the recall petition, and that the mail-balloting provision in MEA's bylaws did not apply to recall elections. The court declined to enjoin MEA from expending funds to shape the results of the recall election but ordered it to provide its member list and financial records relating to the Chugach Electric takeover to Rewire. The court also ordered MEA to report the total number of valid signatures on Rewire's recall petition and, if the number of valid signatures was insufficient, to justify the rejection of any signatures alleged to be invalid.

MEA moved for partial reconsideration, insisting that it should not be required to disclose so many financial records and arguing that it had validated sufficient signatures and should not be required to continue counting. MEA's motion for reconsideration was denied.

MEA sought to depose Rewire to learn the identity of Rewire's members and financial backers. Rewire moved for an order quashing the deposition as premature under Alaska Civil Rule 26 and unlikely to yield relevant information. MEA conceded that the noticed deposition was premature under dis-

---

1. For convenience, this opinion will refer to Sterling and Willis collectively as Rewire unless con-

text dictátes otherwise.

covery rules, but requested expedited discovery. Rewire opposed MEA's request.

The superior court denied MEA's request for expedited discovery and issued an order quashing the notice of deposition. The order also clarified and confirmed the court's earlier ruling that mail balloting did not apply in recall elections. Rewire then moved for a hearing to air contentions that MEA had violated the superior court's prior order by failing to meet with Rewire to discuss how the recall election would be conducted, failing to supply a final tally of valid signatures, and failing to disclose financial records as ordered. MEA countered by moving for summary judgment, seeking to have Rewire's petitions declared invalid. Rewire cross-moved for summary judgment. The superior court denied MEA's summary judgment motion and granted Rewire's cross-motion.

### C. *Proceedings in This Court and Recall Election*

MEA petitioned this court for review of the superior court's rulings. We granted limited review of the superior court's order requiring MEA to conduct a recall election, and we determined that under the MEA bylaws, MEA members were entitled to vote in the recall election by mail. Our order, issued one day before MEA's annual meeting, set forth procedures to govern the meeting and subsequent mail balloting. We then returned full supervisory authority over this case to the superior court.

The day after we issued our order, MEA placed an advertisement in the *Anchorage Daily News* that appeared to violate provisions in our order forbidding MEA from attempting to influence the results of the recall election. Sua sponte, we ordered MEA to show cause why it should not be held in contempt. After hearing argument, we found that MEA's advertisement had violated the order, but concluded that the violation was not wilful and declined to hold MEA in contempt.

MEA proceeded to hold its annual meeting and to conduct the recall election. In keeping with the procedures that this court had established, Rewire was given time at the meeting to present its charges against the

directors, and the directors were given an opportunity to respond. MEA members then voted using mail ballots that included a summary of Rewire's charges and the directors' responses. After the deadline for returning mail ballots, MEA counted all ballots, reconvened the annual meeting, and announced the results of the recall election: all directors had retained their positions.

### D. *Post–Recall Proceedings*

While mail balloting on the recall was in progress, MEA sought permission from the superior court to announce the results of regular coop elections that were concluded during the opening day of MEA's annual meeting. To protect against the possibility that announcing these election results might influence the ongoing mail ballot process, the superior court denied MEA's requests. Rewire subsequently complained of MEA activities that allegedly violated the spirit of the superior court's order barring public announcements by MEA. Based on these alleged violations, Rewire demanded that MEA be required to show cause why it should not be held in contempt. After conducting a hearing on Rewire's motion, the superior court found MEA guilty of four acts of contempt and fined MEA a total of $1,000.

Rewire later moved for attorney's fees encompassing all work related to the recall petition and election process. MEA opposed Rewire's motion. The superior court found Rewire to be the prevailing party in the litigation and ruled that the organization was a public interest litigant. Based on these findings the court awarded Rewire $91,243 as full reasonable attorney's fees.

MEA appeals. The sole issues on appeal are whether MEA should have been held in contempt and whether Rewire was entitled to its attorney's fees award.

## III. *DISCUSSION*

### A. *Standards of Review*

To determine whether Rewire was entitled to prevailing party status, we must first examine the superior court's ruling on the legal merits of the recall issue. We

apply our independent judgment to determine whether the superior court erred in granting Rewire's cross-motion for summary judgment and declaring that Rewire's recall petitions were valid and required a membership vote.[2]

If we determine that the superior court's underlying rulings were correct, we then review for an abuse of discretion the court's determinations that Rewire was the prevailing party, that Rewire was a public interest litigant, and that actual attorney's fees of $91,243 incurred by Rewire were reasonable.[3]

■ On the issue of contempt, we will set aside the superior court's findings that MEA intentionally acted to influence the results of the recall election in wilful violation of a court order only if the findings are clearly erroneous.[4]

### B. Attorney's Fees

■ The superior court awarded Rewire $91,243 in attorney's fees as a prevailing public interest litigant. MEA contends that Rewire did not deserve to be designated the prevailing party because its recall effort lacked legal merit.

### 1. Rewire prevailed.

■ Under Alaska law, the prevailing party is the one who successfully prosecuted or defended the action and prevailed on the main issue.[5] MEA posits that this case was primarily about whether a recall election should be held, insists that the recall petition was invalid as a matter of law and should not have been sent to a vote, and concludes that MEA should therefore have prevailed on the main issue. Rewire responds that its suit was primarily about enabling coop members to exercise membership rights, points out that it requested and received multiple forms of relief,[6] and argues that, in any event, it properly prevailed on all issues.

The superior court ruled that Rewire's recall allegations warranted an election and granted Rewire other relief. The court therefore did not consider the relative importance of Rewire's success in obtaining various forms of relief.[7] Accordingly, we begin by reviewing the trial court's ruling that Rewire's petitions were legally valid, even though that issue became functionally moot when MEA's directors all retained their seats in the recall election.[8]

---

**2.** See *Taranto v. North Slope Borough,* 909 P.2d 354, 355–56 (Alaska 1996).

**3.** See *McNett v. Alyeska Pipeline Serv. Co.,* 856 P.2d 1165, 1167 (Alaska 1993); *Citizens for the Preservation of the Kenai River, Inc. v. Sheffield,* 758 P.2d 624, 626 (Alaska 1988); *H.D. De Witt v. Liberty Leasing Co. of Alaska, Inc.,* 499 P.2d 599, 601 (Alaska 1972).

**4.** Cf. *Tyler v. Heywood,* 258 Neb. 901, 607 N.W.2d 186, 189 (2000) ("A trial court's factual finding in a contempt proceeding will be upheld on appeal unless the finding is clearly erroneous."); *Dale v. Dale,* 341 S.C. 516, 534 S.E.2d 705, 707 (App.Ct.2000) ("This court will reverse a trial judge's decision regarding contempt only if it is without evidentiary support or is an abuse of discretion."); *Czaja v. Czaja,* 208 W.Va. 62, 537 S.E.2d 908, 917 (2000) ("In reviewing the findings and facts and conclusions of law of a circuit court supporting a civil contempt order, we apply a three-pronged standard of review. We review the contempt order under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a de novo review.").

**5.** See *H.D. De Witt,* 499 P.2d at 601.

**6.** Specifically, Rewire contends, and MEA does not dispute, that Rewire succeeded in obtaining much of the relief it requested in the course of litigation: an order requiring MEA to provide access to member lists and financial records, an order requiring the bylaw amendment to be placed on the ballot at the annual meeting, an order forbidding MEA from spending coop funds to attempt to influence election results, and an order requiring MEA to validate the signatures on the recall petition and report the tally.

**7.** Determining whether Rewire became a prevailing party by virtue of obtaining these other forms of relief would therefore require additional consideration by the superior court. Cf. *Herrick's Aero–Auto–Aqua Repair Serv. v. State, Dep't of Transp. & Pub. Facilities,* 754 P.2d 1111 (Alaska 1988) (remanding for determination of whether defendant was prevailing party in light of resolution of issues on appeal).

**8.** Cf. *Bruner v. Petersen,* 944 P.2d 43, 47 n. 4 (Alaska 1997); *LaMoureaux v. Totem Ocean Trailer Express, Inc.,* 651 P.2d 839, 840 n. 1 (Alaska 1982).

Alaska Statute 10.25.140 requires that an electrical cooperative's bylaws "provide for the removal of directors from office for cause and for the election of their successors." Article IV, section 5 of the MEA bylaws does so:

> Any member may bring charges for cause against a board member and, by filing with the Secretary such charges in writing together with a petition signed by at least five per centum (5%) of the members, may request the removal of such board member by reason thereof. Such board member shall be informed in writing of the charges at least forty (40) days prior to the meeting of the members at which the charges are to be considered and shall have an opportunity at the meeting to be heard in person or by counsel and to present evidence in respect of the charges and the person or persons bringing the charges against him shall have the same opportunity. The question of the removal of such board member shall be considered and voted upon at the meeting of the members and any vacancy created by such removal may be filled by vote of the members at such meeting without compliance with the foregoing provisions with respect to nominations.

On its face, Rewire's recall petition accused MEA board members of violating provisions of Alaska law and MEA's bylaws relating to open meetings:

> We, the undersigned, as member-owners of Matanuska Electric Association, Inc. (MEA), under Article IV, Section 5 of the MEA bylaws, bring charges for cause against Barbara Miller, [William] Folsom, James Hermon, Rosemarie DePriest, Craig Campbell, Rodney Cottle, and Wesley Pollock based on their violations of the state law and the MEA bylaw requiring Board meetings to be open (AS 10.25.175 and Bylaw Article III, Section 8), and based on their failure to give notice of

> board meetings as required by Bylaw Article III, Section 3....

> We hereby request removal of the listed Board members by reason of each of the acts of wrongdoing described above, any one of which constitutes sufficient cause, standing alone, to warrant removal of each listed Board member, and request that a special meeting of the MEA member-owners be held at the earliest possible date to consider and vote on removal.[9]

Addressing these allegations, the superior court ruled that the charge of violating state law and bylaw requirements governing open meetings was a legally sufficient basis for recall. Concerning the petition's language alleging that board members failed to provide notice of a board meeting, the court ruled that the accusation might have been legally sufficient if properly charged but that in fact it was not properly charged. The court reasoned that the MEA bylaw cited by the recall petition in support of this charge—article III, section 3—dealt only with notice of MEA membership meetings, not board meetings. In the court's view, the bylaw provision governing board meetings—article V, section 3—only required board members to be notified of board meetings. The court thus concluded that the petition's charge of failing to give notice of a board meeting was facially "insufficient to support a recall." The court nevertheless determined that the properly charged open meeting violation was severable from the improper notice violation; on that basis, the court ruled that MEA was required to submit the open meeting charge to its membership.

MEA challenges this ruling, arguing that the failure-to-give-notice charge and allegations that Board policies had been violated amounted to material misrepresentations invalidating the entire petition. MEA also contends that the recall petition was invalid because it named multiple directors. Finally, MEA argues that the open meeting charge should not have been sent for a mem-

---

**9.** On its reverse side, Rewire's card-format petition advanced another accusation based on the board's participation in the Chugach Electric buyout plan: "In addition, the actions of each of the directors listed on the reverse, in connection with the Chugach buyout, violated the MEA Board Policies relating to the appropriate roles and responsibilities of the Board and the General Manager." This additional accusation appeared as an introduction in another form of the Rewire petition; it appeared within the body of yet another version.

ber vote because Rewire did not properly present evidence supporting the charge.

### a. Severing legally insufficient charges from the ballot

MEA contends that the recall petition was invalid because it contained legally insufficient charges and misrepresentations. MEA notes that the recall petition's allegation that the board had violated article III, section 3 of MEA's bylaws by failing to give notice of a board meeting could not have been true because article III, section 3 applies to member meetings rather than board meetings. MEA also argues that the allegation that board members had violated board policies could not be cause for removal, because any board action inconsistent with board policy would operate as an implicit policy amendment.

Citing a corporate proxy solicitation case, *Brown v. Ward*,[10] MEA claims that including these "misrepresentations" invalidated Rewire's recall petition. In *Brown* a corporation sued to prevent a shareholder from voting proxies he received after sending a proxy solicitation that contained statements, which the corporation contended were false and misleading.[11] Because state statutes forbidding false statements in proxy solicitations had not become effective when the shareholder sent his proxy solicitation, the *Brown* court applied a common law requirement "that proxy solicitations be free from materially false or misleading statements."[12] The court compared federal standards of materiality with those set forth in the Second Restatement of Torts and determined that the proper inquiry was whether the misrepresentation would have been likely to influence other shareholders deciding whether to grant their proxies.[13] The court found Ward's proxy solicitation to be materially false as a matter of law and invalidated the proxies he obtained using the solicitation.[14]

MEA contends that corporate proxy solicitations are similar to Rewire's recall petition because "[b]oth involve solicitations of fellow shareholders/members in an attempt to influence who the directors of the corporation will be." MEA argues that in both situations there is a public interest in preventing shareholders from selecting their leadership based on false information and that invalidation of the signatures obtained through misrepresentations is the only way to prevent a faction from unfairly controlling the corporation.

But, in our view, corporate proxy solicitations differ significantly from rural electrical coop recall petitions. As Rewire correctly observes, allegations in a recall petition "are, by definition, disputed charges to be considered and resolved by the members." To support its argument that the open meeting charge was severable from any legally insufficient charges in the petition and was therefore properly sent to a member vote, Rewire relies on the principles expressed in a trio of state election law cases—*Meiners v. Bering Strait School District*,[15] *McAlpine v. University of Alaska*[16] and *von Stauffenberg v. Committee for an Honest and Ethical School Board*.[17]

In *Meiners* we considered a petition to recall school board members—a process governed by state statute.[18] As an initial point of reference, we noted the need to "avoid wrapping the recall process in such a tight legal straightjacket that a legally sufficient recall petition could be prepared only by an attorney who is a specialist in election law matters."[19] We proceeded to hold that, when a recall petition sets forth multiple allegations—some that meet statutory recall criteria and others that are insufficient—the insufficient grounds may be severed and the valid grounds submitted to voters without

10. 593 P.2d 247 (Alaska 1979).

11. *Id.* at 248–49.

12. *Id.* at 249–51.

13. *Id.* at 251.

14. *Id.*

15. 687 P.2d 287 (Alaska 1984).

16. 762 P.2d 81 (Alaska 1988).

17. 903 P.2d 1055 (Alaska 1995).

18. *Meiners,* 687 P.2d at 290.

19. *Id.* at 301.

revision.[20] In reaching this conclusion, we explained that the proper way for challenged board members to defend themselves from legally sufficient but unfounded charges is to exercise their right to include a rebuttal statement on the ballot.[21] We rested our conclusion on our desire to avoid "artificial technical hurdles" and on public policy favoring the interpretation of recall statutes in a way that permits the public to express its will.[22]

We extended *Meiners* reasoning to the initiative process in *McAlpine,* where a university challenged an initiative that proposed to create a statewide system of community colleges and to grant the system property from the university.[23] We determined that the initiative's proposed grant of university property would violate statutory and constitutional provisions forbidding appropriations by initiative.[24] Relying on *Meiners,* however, we declared that the appropriate remedy was to sever the offensive part of the initiative and place the remaining parts on the ballot.[25]

We revisited and elaborated on the issue of recall petitions in *von Stauffenberg,* which involved an effort to recall five school board/assembly members.[26] In that case the superior court concluded that the petition's first and fourth paragraphs stated adequate grounds for recall and ordered those paragraphs certified to appear on the ballot.[27] School board members appealed, arguing that the first and fourth paragraphs were legally insufficient and that the superior court erred in failing to inquire into the truthfulness of the allegations.[28] Although we determined that the disputed provisions were legally insufficient to support recall, we allowed those provisions to be severed and

held that the superior court had correctly refused to evaluate the truthfulness of the legally sufficient allegations.[29]

Rewire persuasively argues that rural school boards are substantially similar to rural electrical cooperative boards and that *Meiners, McAlpine,* and *von Stauffenberg* should therefore inform our analysis here.

Like the statute in *Meiners,* article IV, section 5 of the MEA bylaws allows removal of board members for cause, requires the collection of signatures to be filed with a clerk, and provides board members against whom charges have been brought a forum in which to refute the accuracy of the charges before a vote is taken.[30] In the present setting, then, just as in the rural school board setting considered in *Meiners,* important considerations of public policy favor an approach that places all legally sufficient charges on the recall ballot to avoid erecting "artificial technical hurdles" to recall and allow the process to operate in a way that permits the electorate to express its will.

Nothing in the MEA bylaws renders invalid a recall petition that includes both legally sufficient and legally insufficient charges. We conclude, then, that the superior court did not err in requiring MEA to place Rewire's open meeting charges on the agenda at the annual meeting.

### b. *Naming multiple directors*

MEA also contends that Rewire's recall petition was invalid because it named multiple directors. MEA relies on *Zimmerman v. Municipal Clerk of the Township of Berkeley,*[31] a New Jersey superior court case involving a petition to remove a mayor and a council member from office for mismanage-

---

**20.** *Id.* at 302–03.

**21.** *Id.* at 301.

**22.** *Id.* at 296.

**23.** *McAlpine,* 762 P.2d at 82.

**24.** *Id.* at 89–91.

**25.** *Id.* at 82, 92–96.

**26.** *von Stauffenberg,* 903 P.2d at 1057.

**27.** *Id.* at 1058.

**28.** *Id.* at 1059.

**29.** *Id.* at 1060.

**30.** *Cf. Meiners,* 687 P.2d at 291 (describing the process for recalling regional school board members).

**31.** 201 N.J.Super. 363, 493 A.2d 62 (App.Div. 1985).

ment.[32] The *Zimmerman* court commented that it made "good sense" to "requir[e] a separate petition for each incumbent sought to be recalled."[33] But it based its decision on New Jersey statutes that it construed as expressly requiring a separate petition for each elected official recalled.[34] *Zimmerman* has never been followed outside New Jersey.

■ Rewire points out that neither MEA's bylaws nor Alaska laws include the one-at-a-time requirement found in New Jersey election statutes. The Alaska statute governing electrical cooperatives requires coop bylaws to "provide for the removal of directors from office for cause" but does not specify the manner in which directors may be removed or whether they must be removed individually.[35] MEA's bylaws enable any member to "bring charges for cause against a board member" requesting "the removal of such board member." The bylaws use the singular, "such board member," to describe an accused director's rights to notice and an opportunity to present evidence. But there is no clear one-at-a-time requirement.

We have not read such a requirement into the statutes governing school board recalls.[36] As mentioned in our discussion of severance, there is good reason to take a similar approach when interpreting recall requirements for electrical coop directors. We conclude that Rewire did not act improperly by listing multiple directors in its recall petition.

#### c. *Evidentiary requirements*

MEA's last argument on the merits is that no recall election should have been required because Rewire failed to present sufficient evidence establishing the truth of the open meeting charge.

■ First, MEA argues that the "for cause" requirement of AS 10.25.140[37] and article IV, section 5 of the MEA bylaws[38] would be meaningless unless petitioners were required to prove that cause actually existed. MEA relies on *Mitchell v. Concerned Citizens of CVEC, Inc.*,[39] an Alabama case involving the recall of electrical cooperative trustees. In *Mitchell* a coop trustee who had been removed by membership vote sued for reinstatement on grounds that his opponents had not presented evidence showing cause to remove him.[40] The *Mitchell* court held that the members should be asked to vote on removal only if the trustee's opponents had offered evidence showing cause for removal.[41] The court concluded that "if the evidence presented established a cause, then whether the weight of the evidence presented at the hearing was great enough to justify Mitchell's removal was a question for the Cooperative members voting."[42]

MEA asks that this court follow *Mitchell* by holding that unless petitioners present evidence supporting the charges against the directors, they have not carried their burden of establishing cause for removal. MEA recognizes that, in the context of school board recalls, we have emphasized that voters are responsible for determining the truth or falsity of the charges and the judiciary's role is confined to assessing the legal sufficiency of the charges.[43] But MEA argues that the

32. *Id.* at 63–64.

33. *Id.* at 65–66.

34. *Id.* at 64–65.

35. AS 10.25.140 reads, in pertinent part: "The bylaws shall provide for the removal of directors from office for cause and for the election of their successors."

36. *See, e.g., von Stauffenberg v. Comm. for an Honest & Ethical Sch. Bd.*, 903 P.2d 1055, 1057 (Alaska 1995) (five members named in one recall petition); *Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 291, 303 (Alaska 1984) (eleven members named in one recall petition).

37. *See* text *supra* at ——.

38. *See* text *supra* at ——.

39. 486 So.2d 1283 (Ala.1986).

40. *Id.* at 1284.

41. *Id.* at 1286–87.

42. *Id.* at 1287.

43. *von Stauffenberg*, 903 P.2d at 1060 n. 15 (citing *City Council of Gladstone v. Yeaman*, 768 S.W.2d 103, 107 (Mo.App.1988); *In re Recall of Call*, 109 Wash.2d 954, 749 P.2d 674, 676 (1988); *In re Recall of Redner*, 153 Wis.2d 383, 450 N.W.2d 808, 810 (App.Ct.1989); 4 Eugene McQuillin, *Municipal Corporations* § 12.251.35 (3d ed.1992)).

recalls of school board members are functionally different from the recall of coop directors because in school board recalls there is no meeting at which charges and rebuttals are made. MEA suggests the electrical coop's annual meeting might function as a "mini-trial" producing a record that can be reviewed to determine whether sufficient evidence of wrongdoing was presented.[44] According to MEA, allowing a recall vote without requiring evidence of cause for removal would render the cause requirement meaningless. MEA contends that at the annual meeting Rewire did not present sufficient evidence of an open meeting violation, so the charge should never have been put to a member vote.

Rewire denies that it was required to offer evidence supporting its open meeting charge at the annual meeting and insists that, as in *Meiners* and *von Stauffenberg*, the question of the veracity of legally sufficient charges lies exclusively with voters. Rewire argues that the annual meeting was not equivalent to a trial and that the court should not evaluate evidence of what happened at the annual meeting. Rewire emphasizes the ways in which the meeting differs from a trial—lack of discovery, cross-examination, etc.—and argues that imposing a *Mitchell*-like evidentiary requirement would render the recall process too cumbersome for coop members to use. Rewire also insists that evidence supporting the open meeting charge was presented at the annual meeting.

In school board recall elections, compliance with the cause requirement is tested by evaluating the legal (rather than factual) sufficiency of the charges against office holders.[45] Contrary to MEA's assertion, that model demonstrates that no evidentiary threshold is

necessary to make the "for cause" requirement meaningful. And, while it is true that public recall elections differ from the process described in the MEA bylaws, the meeting described in the MEA bylaws does not necessarily have the trial-like character MEA claims.

The MEA bylaws provide that accused board members and persons bringing charges against them must have the opportunity "to present evidence in respect of the charges" at a meeting of the members and that "[t]he question of the removal of such board member shall be considered and voted upon at the meeting of the members." The imperatives are that both sides be given the opportunity to present evidence and that a member vote be held. The MEA bylaws do not condition the vote on whether persons bringing charges against a board member choose to use their opportunity to present evidence. Nor do the bylaws suggest that anyone other than the voting membership is responsible for evaluating the truth of the charges against a board member.

Here, we conclude that the applicable recall process did not condition the vote on Rewire's ability to produce evidence supporting its charge at the annual meeting. Accordingly, we hold that the superior court based its prevailing-party finding on a correct evaluation of the underlying merits of the case.

### 2. *Public-interest-litigant status*

Under Alaska Rule of Civil Procedure 82(b)(2), prevailing parties who do not recover a money judgment are awarded a fraction of their actual attorney's fees.[46] But prevail-

---

**44.** Like the bylaws at issue in *Mitchell*, 486 So.2d at 1286, MEA bylaws provide targeted directors and petitioners an opportunity to be heard and to "present evidence in respect of the charges."

**45.** *E.g., Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 298–302 (Alaska 1984).

**46.** Alaska Civil Rule 82 provides:

(a) Except as otherwise agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.

(b)....
 (2) In cases in which the prevailing party recovers no money judgment, the court shall award the prevailing party in a case which goes to trial 30 percent of the prevailing party's reasonable actual attorney's fees which were necessarily incurred, and shall award the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees which were necessarily incurred. The actual fees shall include fees for legal work customarily performed by an attorney but which was delegated to and performed by an investigator, paralegal or law clerk.

ing public interest litigants are entitled to full reasonable attorney's fees.[47] In this case, MEA questions the superior court's determination that Rewire was a public interest litigant.

Determining whether a party is a public interest litigant requires us to inquire into the " 'the character of the professed public interest litigant and the nature of that litigant's real financial stake in the lawsuit.' "[48] A party is properly considered a public interest litigant if (1) the case was designed to effectuate strong public policies; (2) numerous people would benefit if the litigant succeeded; (3) only a private party could be expected to bring the suit; and (4) the litigant lacked sufficient economic incentive to bring suit.[49] MEA argues that Rewire should not have been considered a public interest litigant because it had economic incentives to bring suit.[50] MEA claims that Rewire was controlled by the IBEW, which was trying to use Rewire to install union-friendly directors in MEA's board.

When making this argument to the superior court, MEA submitted an affidavit from MEA's director of member and public relations, Bruce Scott, who described five of Rewire's directors as having "ties to the IBEW."[51] MEA pointed out that Rewire admitted receiving financial support from the IBEW. MEA cites *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*[52] to argue that potential economic benefit to

IBEW members should deprive Rewire of public-interest-litigant status; MEA also cites *Kachemak Bay Watch, Inc. v. Noah*[53] for the proposition that the party seeking public-interest-litigant status bears the burden of proving a lack of economic incentives to sue. MEA insists that "[f]or purposes of determining whether a party is a public interest litigant, the primary focus must be on who is funding the litigation." MEA claims that, by refusing to reveal its funding sources, Rewire failed to prove entitlement to public-interest-litigant status.[54]

Rewire argues that it was properly considered a public interest litigant because its members—including Scott Sterling and Edward Willis—were residential electrical consumers who would not gain substantial financial benefit from Rewire's suit. Rewire argues that its consumer members should not be deprived of public-interest-litigant status simply for receiving contributions from other organizations. We agree that contribution sources are not determinative of public interest status.

We have never held that a group's status as a public interest litigant depends on its source of funding. In *Citizens for the Preservation of the Kenai River, Inc. v. Sheffield*, we held that it was not an abuse of discretion to consider a non-profit organization formed to challenge the validity of a regulation prohibiting use of certain boats on the Kenai River to be a public interest litigant, even

47. *Dansereau v. Ulmer*, 955 P.2d 916, 918 (Alaska 1998); *Hunsicker v. Thompson*, 717 P.2d 358, 359 (Alaska 1986).

48. *Eyak Traditional Elders Council v. Sherstone, Inc.*, 904 P.2d 420, 426 (Alaska 1995) (quoting *Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 171 (Alaska 1991)).

49. *Kenai Lumber Co. v. LeResche*, 646 P.2d 215, 222–23 (Alaska 1982).

50. MEA agrees that the third factor is met and has elected not to pursue the question of whether factors one and two were met.

51. Scott said one of Rewire's directors was a retired union member, two others had previously received contributions from the union during political campaigns, a fourth director had received such contributions and was the father of two union members, and a fifth director had

received such contributions and was married to a retired union member.

52. 934 P.2d 759, 764 (Alaska 1997).

53. 935 P.2d 816, 828 (Alaska 1997).

54. In its reply brief, MEA also points to literature circulated by the IBEW in February 1999 expressing the union's desire to change the MEA board to one more willing to resolve an on-going strike and stating that a petition committee was gathering signatures to force a recall. Although MEA submitted the union materials to the superior court when opposing Rewire's motion for a preliminary injunction in March 1999, MEA did not mention the union literature when opposing Rewire's motion for attorney's fees in November 1999 and instead emphasized that Rewire had admitted receiving financial support from the union.

though some members had economic interests that would prevent them from personally qualifying for public interest status:

> The economic incentives of the members represented by [Citizens] vary considerably from person to person. For example, one member of [Citizens], who is a lodge owner and used boat dealer, estimated in an affidavit that he will suffer a loss of $20,000 to $30,000 per year as a result of the 35 horsepower limitation. Several other members claimed lesser losses from inability to use or sell their large motors, and the like. We can speculate that those members that did not submit affidavits had even smaller economic incentives. However, whether an entity is a public interest litigant cannot depend on the interests of a single member. Rather, it must depend on the interests of typical members. We find that the superior court could have concluded that, of the alleged one hundred or more individuals represented by [Citizens], all but a few had economic incentives that were insubstantial or diffuse enough to satisfy the fourth element of the public interest test.[55]

 Whether a group satisfies the fourth prong of the public-interest-litigant test thus depends on the interests of typical members.[56] When all or most members who control a group or association would individually reap substantial economic benefits from successful litigation, the group itself may prop-

erly be denied status as a public interest litigant.[57] But a group may be a public interest litigant even though some members might profit from successful litigation.[58] Here, Rewire presented sufficient evidence to make a prima facie showing that most of its members did not have a substantial economic interest in the litigation.

As we stated in *Gwich'in Steering Committee v. State, Office of the Governor,* when a group claiming to be a public interest litigant provides relevant information about its members' interests and the opposing party does not provide detailed information to rebut the assertion of public-interest-litigant status, the group may be considered a public interest litigant.[59]

In this case, Rewire provided information supporting the superior court's determination that Rewire's members were residential electrical consumers who individually could hope to gain little economic benefit from the removal of the accused MEA directors. Rewire alleged that it had registered with MEA as a member group attempting to influence the results of a coop election. In its verified complaint, Rewire described itself as "an unincorporated association composed of members of the Matanuska Electric Association, Inc. seeking to recall all of the incumbent members of the board of directors."

Rewire repeated this self-characterization in a later memorandum supporting its motion

**55.** 758 P.2d 624, 626–27 (Alaska 1988).

**56.** *Id.; see also Municipality of Anchorage v. Citizens for Representative Governance,* 880 P.2d 1058, 1061 (Alaska 1994) ("Generally, we analyze the public interest litigant status of the group by looking to the status of the members.").

**57.** *See Fairbanks Fire Fighter's Ass'n, Local 1324,* 934 P.2d at 763–64 (affirming determination that union seeking restored overtime funding was not public interest litigant when relief requested was direct payment of substantial funds to union members); *see also In re 1981, 1982, 1983, 1984 and 1985 Delinquent Property Taxes Owed to the City of Nome, Alaska,* 780 P.2d 363, 368 (Alaska 1989) (noting that Nome Eskimo Community owned two taxed lots and so stood to gain economically from successful litigation and was not public interest litigant).

**58.** *See Gwich'in Steering Comm. v. State, Office of the Governor,* 10 P.3d 572, 585 (Alaska 2000) (tribal-based organization seeking access to in-

formation was public interest litigant even though members may have been motivated by threats to their subsistence lifestyle); *Spenard Action Comm. v. Lot` 3, Block 1, Evergreen Subdivision,* 902 P.2d 766, 782 (Alaska 1995) (nonprofit neighborhood association suing to abate houses of prostitution in Spenard should have been considered a public interest litigant even though group members might receive indirect financial benefits if successful litigation improved property values); *Citizens for Representative Governance,* 880 P.2d at 1060, 1062–63 (unincorporated association suing to preclude a school board recall was public interest litigant because the small stipend received by school board members belonging to the association was not sufficient economic incentive to preclude public-interest-litigant status).

**59.** 10 P.3d 572, 585 (Alaska 2000).

for a preliminary injunction and in its amended complaint. Rewire co-chair Scott Sterling testified at MEA's annual meeting that Rewire represented 5,000 residential electrical consumers who signed the recall petition and Rewire maintained that position in seeking attorney's fees. When moving for attorney's fees, Rewire described itself as "an informal committee of MEA members who shared a common concern regarding MEA's Board, its secret decision making, its disregard of membership rights, and its unrestrained spending of membership funds on a futile campaign to take over Chugach Electric." Rewire further specified that its members included Scott Sterling, Edward Willis, and other residential consumers of electricity from MEA. Rewire emphasized that it sought declaratory and injunctive relief and that it had never sought monetary damages.

At various times, MEA supplied the superior court with evidence that the IBEW had provided money to Rewire, that five of Rewire's directors had loose personal ties to the IBEW, and that the IBEW formally supported Rewire's efforts. That evidence might have supported, but did not compel, a finding that Rewire's suit was aimed at improving the IBEW's bargaining position to the benefit of union members.

Nevertheless, MEA complains that it was improperly denied discovery of Rewire's funding sources. But MEA did not properly request discovery of Rewire's funding sources when opposing Rewire's motion for attorney's fees.[60]

Given the totality of the evidence, then, substantial evidence supported rejection of MEA's contention that Rewire was driven by the economic goals of IBEW members. The superior court did not abuse its discretion when ruling that Rewire was entitled to full reasonable attorney's fees as a public interest litigant.

### 3. The size of Rewire's attorney's fees award

Rewire moved the superior court for a total attorney's fees award of $91,243. In opposing Rewire's motion, MEA argued that Rewire's proposed award included $55,493.50 in improper fees. After receiving Rewire's reply and updated figures, the superior court issued an order awarding Rewire $91,243 as full reasonable attorney's fees.

MEA contends that this award improperly included fees incurred for work outside the scope of this litigation—such as work related to the general recall effort—and fees incurred for appellate work. MEA also complains that the format of Rewire's billing statements exacerbated this problem of improper billing. According to MEA, entries reflecting improperly billed work were lumped with potentially proper billings; these composite entries masked the time Rewire's attorneys actually spent on this case. In light of these multiple-task entries, MEA calculates that $55,493.50 should be subtracted from Rewire's award.

At the outset, we reject MEA's claim of inadequate documentation. Rewire's original motion for attorney's fees was accompanied by an affidavit of counsel attesting that Rewire had incurred $89,038 in total attorney's and paralegal fees, that Rewire's attached summary accurately reflected the time actually spent, and that all fees were necessarily and appropriately incurred. A table with short descriptions of work performed, arranged by billing attorney and date, was attached. Rewire later submitted a correction and updated the attorney's fees figure to $91,243. No greater specificity was required.

MEA next asserts that Rewire should not have been awarded various fees incurred before Rewire filed its suit or for fees related to the general recall effort, as opposed to the lawsuit itself. But in our view, the billings included in this disputed category fall suffi-

**60.** MEA sought this information early in the case for other purposes. But it has previously acknowledged that its early attempt to discover the identity of Rewire's members and contributors was premature under Alaska Civil Rule 26 and was therefore properly denied. By the time the issue of attorney's fees arose, that discovery effort had long been a dead issue. MEA's passing mention of new discovery in response to Rewire's request for attorney's fees did not revive its earlier request for discovery.

ciently close to the zone of active litigation to be compensable under Civil Rule 82. Most of the work in this category appears to have been performed in anticipation of or in preparation for active litigation, including matters such as preparation before requesting a court order or action related to the recall that was necessary to comply with the court's directives. Since Rewire could not reasonably be expected to attempt compliance with the court's decisions without guidance from its attorneys, the superior court did not abuse its discretion in extending the award of Rewire's attorney's fees to work within this category.

MEA's last point presents a more difficult issue. MEA contends that the superior court should not have awarded Rewire fees incurred in responding to MEA's petitions for appellate review. MEA argues that, under Appellate Rule 508(e), only this court has power to award fees for work performed in Supreme Court proceedings. MEA contends that our decisions in *State, Department of Highways v. Salzwedel,*[61] *O.K. Lumber Co. v. Providence Washington Insurance Co.,*[62] and *Hickel v. Southeast Conference*[63] support its position. But these cases are not controlling.

*Salzwedel* does say that the "Appellate Rules govern appellate proceedings,"[64] citing *Continental Insurance Co. v. United States Fidelity & Guaranty Co.*[65] for that proposition.[66] But *Salzwedel* did not purport to hold that the superior court lacked authority to award appellate fees in all situations. It held only that Civil Rule 72(k) ordinarily does not entitle landowners to compensation for appellate attorney's fees in eminent domain proceedings.[67] *O.K. Lumber* is likewise inapposite. There, O.K. Lumber challenged a small portion of an attorney's fees award that reflected work performed in connection with a

petition for review to this court.[68] In addressing this point, we simply assumed arguendo that the appellee had no right to recover fees for work on interlocutory appellate proceedings.[69] We nonetheless affirmed the superior court's overall award, finding that it was reasonable, even excluding the time spent on the petition for review.[70]

And *Hickel* also fails to support MEA's position. There, in denying a prevailing party public interest litigant any award for fees incurred preparing unsuccessful petitions to this court, we stated that "a public interest litigant's general prevailing party status does not mean the litigant should recover fees incurred in bringing or defending petitions for review in which that party does not prevail."[71] But we said nothing about fees incurred for successful petitions or for opposing unsuccessful petitions.

Indeed, the concerns that we expressed in *Hickel* suggest that a prevailing public interest litigant should normally recover full reasonable fees for successful petitions, and we have expressly recognized this proposition in an analogous setting. Specifically, when contractual or statutory fee-shifting provisions entitle a party to full, reasonable attorney's fees, we have held that the superior court may award the overall prevailing party attorney's fees incurred in appellate work that was not dispositive on the overall merits of the case.[72]

Given these prior decisions, we cannot say that it was an abuse of discretion to award Rewire attorney's fees incurred in responding to MEA's petitions for review. Although MEA's first petition yielded an order reversing the superior court's decision to forbid mail balloting, the order upheld the decision

**61.** 596 P.2d 17 (Alaska 1979).

**62.** 759 P.2d 523 (Alaska 1988).

**63.** 868 P.2d 919 (Alaska 1994).

**64.** 596 P.2d at 19.

**65.** 552 P.2d 1122, 1127 (Alaska 1976).

**66.** *Salzwedel,* 596 P.2d at 19.

**67.** *Id.*

**68.** *O.K. Lumber Co.,* 759 P.2d at 528.

**69.** *Id.*

**70.** *Id.*

**71.** 868 P.2d 919, 932 (Alaska 1994).

**72.** *See Gamble v. Northstore P'ship,* 28 P.3d 286, 293 (Alaska 2001); *cf. Rosson v. Boyd,* 727 P.2d 765, 766 (Alaska 1986).

to require a recall election and also included important protections and clarifications that Rewire requested. Further, Rewire successfully opposed MEA's second petition. We therefore affirm the award of attorney's fees to Rewire.

### C. *Contempt*

Our remand order of April 28, 1999, established ground rules governing the period between MEA's annual meeting and the conclusion of mail balloting for the recall election. The order included language that barred MEA from attempting to influence the vote:

> In order to maintain a fair election process, MEA, including its board, management, and other persons, shall be prohibited, from the date of the meeting until the votes have been counted, from using or expending MEA funds, facilities, staff time, or other resources to advertise, campaign, or otherwise attempt to influence, *directly or indirectly*, the votes of the members in the recall election. Individual board members are not prohibited from acting to defend themselves against the recall but may not use MEA funds, facilities, staff, or other resources in so doing. This order does not impose any campaign prohibitions against any other individuals or groups, including Rewire.

On April 29, 1999, the *Anchorage Daily News* printed an MEA advertisement that violated this order. But after a hearing on the issue, we concluded that the violation was not wilful and declined to hold MEA in contempt.

During the contempt hearing before this court, MEA expressly represented that it would not release future information without Rewire's approval or authorization from the superior court. After the case returned to the superior court on remand, MEA sought consent from Rewire to publish a newsletter reporting that MEA members had set voting and attendance records at the annual meeting. Rewire refused to consent to the publication, fearing that it might affect the ongoing recall mail balloting process. MEA then asked the superior court to authorize publication of the newsletter article. The superior court rejected MEA's request, ruling that it appeared to violate this court's April 28 order prohibiting MEA from expending funds to influence the recall election.

A short time later, Rewire moved the superior court to order MEA to show cause why it should not be held in contempt for violating the publicity order. In support of its motion, Rewire complained of numerous violations, including: that MEA posted information on its internet web site that was meant to influence the balloting process; that MEA's director of member and public relations, Bruce Scott, had driven a company car to photograph and intimidate picketers supporting Rewire; and that Scott had spoken to the *Alaska Star* (a local newspaper) and had released the results of an advisory vote to the *Frontiersman* (another local newspaper) without permission from Rewire or the superior court. After a hearing on Rewire's allegations, the superior court found MEA guilty of four counts of contempt under AS 09.50.010(5):[73] (1) giving a statement to the *Alaska Star;* (2) intimidating recall supporters; (3) publishing an internet article titled "MEA members set voting, attendance records"; and (4) failing to remove from the MEA web site an open letter from MEA's general manager, Wayne Carmony, that criticized Rewire.

MEA appeals these contempt convictions. MEA initially suggests that, because the superior court's decision was based on a paper record and MEA was held in contempt for violating an order that this court issued, we should decide de novo whether MEA was in contempt. Rewire counters that the superior court's findings should be set aside only if clearly erroneous.

We reject MEA's argument for de novo consideration and will review the contempt orders under the standard advocated by Rewire. Our approach is consistent with the deferential review used by courts in other

---

**73.** Alaska Statute 09.50.010 states: "The following acts or omissions with respect to a court of justice or court proceedings are contempts of the authority of the court ... (5) disobedience of a lawful judgment, order, or process of the court."

jurisdictions.[74] It also comports with our usual rule that factual findings should be set aside as clearly erroneous if a review of the record leaves us firmly convinced that a mistake has been made.[75] We turn, then, to the evidence relating to each of the acts of contempt.

### Count 1: Bruce Scott's statement to the Alaska Star

On May 6, 1999, the *Alaska Star* published an article reporting the results of an advisory vote showing MEA members favored acquisition of Chugach Electric's assets. The *Alaska Star* article quoted MEA's director of member and public relations, Bruce Scott, as stating that Rewire had opposed MEA's plans to offer prizes for participation in the coop elections. When ordered to show cause why it should not be held in contempt, MEA submitted an affidavit of Scott, who stated that he had been contacted in the usual course of business by a reporter from the *Alaska Star* and that he had simply answered a question directly posed to him. Rewire did not contend that Scott's statement about the prizes was inaccurate and did not offer any evidence other than a copy of the *Alaska Star* article.

■ The superior court found that Scott's interview with the *Alaska Star* "was intended to show [Rewire] in a bad light and to influence the recall election, which prejudiced [Rewire's] right to a free and fair election." In considering whether this finding is clearly erroneous, we must bear in mind that the alleged contempt involves an exercise of free speech—a right that warrants the highest order of constitutional protection [76]—and that Rewire had the burden of establishing MEA's guilt beyond a reasonable doubt.[77] Given that the article reported comments that Scott evidently made in an unsolicited interview, the equivocal nature of Scott's communications, and Rewire's failure to point to any affirmative evidence of factual inaccuracy, we conclude that the evidence fails to support the finding of culpable intent.

### Count 2: Photographing picketers

■ Rewire submitted an affidavit from MEA board member Rodney Cottle stating that picketers supporting Rewire were photographed early one morning by Bruce Scott. According to Cottle, Scott parked an MEA company car across the street from the picketers, got out and photographed the picketers from two different street corners, then returned to the car and drove off.

As with Count 1, we conclude that the evidence fails to support the finding that

---

**74.** *See, e.g., Bowers v. Bowers,* 61 Conn.App. 75, 762 A.2d 515, 518 (2000), *reh'g granted,* 255 Conn. 939, 767 A.2d 1211 (2001) ("A finding of contempt is a question of fact and our standard of review is to determine whether the court abused its discretion in finding that the actions or inactions of the party were in contempt of a court order.") (citations omitted); *Tyler v. Heywood,* 258 Neb. 901, 607 N.W.2d 186, 189 (2000) ("A trial court's factual findings in a contempt proceeding will be upheld on appeal unless the finding is clearly erroneous."); *Dale v. Dale,* 341 S.C. 516, 534 S.E.2d 705, 706 (App.Ct.2000) ("This court will reverse a trial judge's decision regarding contempt only if it is without evidentiary support or is an abuse of discretion."); *Czaja v. Czaja,* 208 W.Va. 62, 537 S.E.2d 908, 917 (2000) (" 'In reviewing the findings of fact and conclusions of law of a circuit court supporting a civil contempt order, we apply a three-pronged standard of review. We review the contempt order under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a de novo review.' ") (quoting *Carter v.*

*Carter,* 196 W.Va. 239, 470 S.E.2d 193, 195 (1996)); *cf. State v. Birkel,* 65 Ohio St.2d 10, 417 N.E.2d 1249, 1250 (1981) ("This court will not reverse the decision of the court below in a contempt proceeding in the absence of a showing of an abuse of discretion."); *Schuster v. Schuster,* 90 Wash.2d 626, 585 P.2d 130, 133 (1978) ("Punishment for contempt of court is within the sound discretion of the judge so ruling. Unless there is abuse of a trial court's exercise of discretion, it will not be disturbed on appeal.").

**75.** *See Mathis v. Meyeres,* 574 P.2d 447, 449 (Alaska 1978).

**76.** *Cf. Mickens v. City of Kodiak,* 640 P.2d 818, 821 (Alaska 1982) ("Laws prohibiting free expression based on the content of the expression, are sustainable only for the most compelling of reasons.").

**77.** *See Continental Ins. Cos. v. Bayless & Roberts, Inc.,* 548 P.2d 398, 407–08 (Alaska 1976) ("When a criminal contempt is involved, all elements of the offense, including that of wilfulness, must be proven beyond a reasonable doubt.").

Scott's purpose for photographing picketers was to attempt to influence the recall election in violation of this court's April 28 order.

*Count 3: Internet publication of election results*

 Rewire complained that MEA had published unofficial annual election results on its internet home page without receiving prior permission from Rewire or the superior court. The article, entitled "MEA members set voting, attendance records," stated that five proposed bylaw amendments had been approved and a sixth rejected. The article also reported the unofficial results of an advisory vote showing that MEA members favored acquiring Chugach Electric and increasing the number of directors on MEA's board. The article reported that the votes for new board members would not be counted until after the recall election was complete.

The superior court found that the internet article reporting election results was designed to influence the recall election and was intentionally posted and amended after the relevant orders in violation of them. The superior court found that MEA's conduct in publishing the article was wilful and prejudiced Rewire's right to a free and fair recall election.

Substantial evidence supports the superior court's findings. This court's April 28 order expressly prohibited MEA, "including its board, management, and other persons," from using MEA resources to "advertise, campaign, or otherwise attempt to influence, *directly or indirectly,* the votes of the members" on the recall issue. Based on this order, the superior court had previously denied MEA permission to release election results in a newsletter. Although the web site omitted one objectionable aspect of the proposed newsletter article—the results of an advisory poll showing that seventy percent of the membership at the annual meeting opposed the recall—it reported the results of another unofficial poll, which purported to show that a substantial majority of MEA's members favored the board's efforts to take over Chugach Electric. Since a central—if not *the* central—point of contention in Re-

wire's dispute with the MEA board was Rewire's view that the board had acted irresponsibly in attempting to take over Chugach Electric, the web site report could reasonably be viewed as an obvious attempt to influence votes in the recall election.

Considering these circumstances, we affirm the superior court's judgment of contempt on this count.

*Count 4: Open letter from Wayne Carmony*

 Rewire alleged that MEA attempted to influence the recall by failing to remove from its internet home page a letter written by its general manager, Wayne Carmony, which contained a paragraph labeled "Know Your Opponents." Carmony's letter labeled Rewire a front group for the IBEW and accused the union of "spending at least $100,000 slandering your MEA board, complaining it was MEA wasting money, [and] ignoring public safety by forcing a winter strike."

Given that this court's April 28 order prohibited MEA's management from attempting to *"directly or indirectly"* influence votes on the recall issue, Carmony's letter can reasonably be seen as a flagrant violation of our April 28 order. In defense of its continued posting of this letter, MEA contended that it was not practical to review each item contained on its home page and that the April 28 order "did not appear to contemplate MEA's staff expending hours of time reviewing relatively obscure home page articles for potentially offensive material." MEA submitted an affidavit from Bruce Scott claiming that he reviewed the home page table of contents to cull articles for purposes of complying with this court's April 28 order but that he simply forgot that Carmony's letter contained a paragraph critical of Rewire. But the superior court rejected MEA's explanation, expressly finding that it lacked credibility:

> Given the high tension created by the election campaign, the associated litigation, and, in particular, the extraordinary level of interest and intervention shown by the Supreme Court in this case, the court does

not find credible MEA's attempt to excuse its conduct on the basis of "inadvertence."

In our view, substantial evidence supports the court's finding that MEA wilfully disobeyed this court's April 28 order by continuing to publish material critical of Rewire. Giving due deference to the superior court's judgment on issues of credibility, we affirm its judgment of contempt on this count.

## IV. CONCLUSION

The attorney's fees award is AFFIRMED. The judgments of contempt on count 3 (for reporting unofficial election results on the MEA web site) and count 4 (for continuing to publish Wayne Carmony's letter on the MEA web site) are AFFIRMED. The two remaining contempt judgments are REVERSED.

EASTAUGH, Justice, not participating.